NUMBER 13-01-00714-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI – EDINBURG
                                                                                                                       
 
THE COMMITMENT OF MICHAEL FISHER,                              Appellant,

v.

THE STATE OF TEXAS,                                                             Appellee.
                                                                                                                       

On appeal from the 284th District Court of Montgomery County, Texas.
                                                                                                                       

O P I N I O N 

Before the Court En Banc
Opinion by Justice Wittig




          Michael Fisher appeals his indeterminate commitment. The commitment was under
the relatively new Texas Sexual Violent Predator Act, effective September 1, 1999. Fisher
raises four complaints; two are issues of first impression. First he attacks the sexually
violent predator statute (SVP) as punitive, both facially and as applied, because Fisher
does not have the mental ability to understand or comply with the order of commitment. 
Second, Fisher argues his due process rights were violated when he was forced to proceed
to trial when he was incompetent. His argument includes the contention he was denied the
opportunity to exercise his right to counsel. We will treat the competency issues generally
together.


 In his third issue, he attacks the SVP statute and commitment order as
unconstitutionally vague. Finally, Fisher claims his fifth amendment privilege against self-incrimination was violated because Fisher was compelled to testify against himself.



          We will only address Fisher’s complaints concerning his mental incapacity. 
Unchallenged psychiatric and psychological testimony showed both Fisher’s inability to
understand the proceedings against him, and his inability to cooperate with his attorney in
his own defense. Fisher also argues his entitlement to a competency hearing before being
subjected to a trial as a sexually violent predator. We agree. Because we reverse and
remand on the competency issues, we do not address his other complaints.
                                                                I
          The State of Texas filed a petition in District Court in Montgomery County, Texas,
to commit Michael Fisher as a sexually violent predator. Fisher requested a hearing to
determine his competency to stand trial. The motion asserted that Fisher had neither a
sufficient present ability to consult with counsel with a reasonable degree of rational
understanding, nor a rational as well as factual understanding of the proceedings against
him. The motion further stated Fisher was an inpatient at the Institutional Division of the
Texas Department of Criminal Justice when the petition was filed. While at the mental
facility, Fisher had episodes of psychotic behavior and was diagnosed with schizophrenia,
paranoid type, and antisocial personality disorder. Fisher was also said to be at least
mildly retarded. The assigned visiting trial judge initially granted the motion for a
competency hearing. The trial court then denied the motion for competency hearing but
liberally allowed a bill of exception.
          In the offer of proof, two mental health experts testified. Fred Fason, M.D., a
psychiatrist, graduated from Baylor University College of Medicine, and was a World War
II veteran. He had been court appointed for clinical evaluations some 2000 times. Dr.
Fason testified Fisher was “totally unable to cooperate and communicate with [his attorney]
and engage him in legal activities.” The doctor stated Fisher had neither a factual nor
rational understanding of the proceedings against him. Dr. Fason further testified Fisher
was mildly retarded, with an I.Q. in the lower 60's. Fisher’s paranoia would lower his
scores, and schizophrenia lowered his cognitive abilities. According to the psychiatrist,
Fisher in no way could conform to the terms of a treatment program, and was doomed to
failure if he were put on outpatient treatment. Dr. Fason’s descriptions of Fisher included
paranoia, schizophrenia, delusional and psychotic. “His view of himself and of his situation
is so unrealistic that it’s psychotic.” Fisher was not capable of reading the MMPI, 


 which
requires a sixth grade education to accomplish. While Fisher could spell “house,” he could
not spell “table” or “judge.” Finally Dr. Fason testified that Fisher thought the present
proceedings were “about trying to send me to a half-way house.” According to the
testimony, Fisher thought he would have to sign for the program and, because he would
refuse to sign, he would then be released. Dr. Fason opined there was no way Fisher
could stand trial competently.
          The State neither cross-examined Dr. Fason nor otherwise challenged his
testimony.
          Dr. Floyd Jennings, psychologist and attorney, also testified Fisher lacked both
factual and rational knowledge of the proceedings. Dr. Jennings further testified Fisher
was unable to assist his attorney in preparation of his defense. Dr. Jennings also had
expertise in sex treatment programs. He stated that sex treatment programs are verbally
intensive, and require a modicum of intellect to effectively participate; this ability is lacking
in Fisher. He is incapable of participating and benefitting from a program for sex offender
treatment “because he could not understand what is asked of him.” According to Dr.
Jennings, to order Fisher to participate in a sex treatment program is virtually a sham. “[A]
word ‘sham’ seems too strong, but it would be one wherein the defendant or the patient
would be anticipated to fail because he could not understand what is asked of him.”
          The State offered a limited cross-examination of Dr. Jennings. Dr. Jennings opined
that he thought of Fisher as dangerous to himself primarily and, secondarily, to a lesser
extent, dangerous to others under the conventional commitment law. See Tex. Health &
Safety Code Ann. §§ 574.034-.035. (Vernon 2001). Dr. Jennings admitted he disagreed
with the State’s attorney regarding commitment of sexually violent predators. Dr. Jennings
also offered an alternative to sexually violent predator commitment. Dr. Jennings
suggested Fisher should be given protective custody and emergency detention under the
conventional civil commitment laws. Fisher could then be properly treated at Vernon State
Hospital.
          After Fisher’s proffer of proof, the trial court observed that neither Chapter 841 of
the Health and Safety Code, nor any other provision in the civil law gives leave to a
competency determination, before going forward with trial on the issues under Chapter
841. This oral pronouncement is verified by the court’s order dated May 29, 2001. The
trial court concluded that a determination of competency to stand trial is neither required
nor appropriate. The court observed: “I think the very nature of the proceeding it may well
be if the legislative intent is to be followed that frequently there will be respondents who are
not, in the sense of a criminal proceeding, competent to stand trial.” Indeed, we agree with
the trial court’s studied conclusion that mental competency is not required by the statute.
          At trial, the 36-year old Fisher was called to the stand for testimony by the State and
cross-examined about his prior convictions and other misdeeds. The two prior felony
convictions that enabled the State to seek commitment were sexual assaults. Both
offenses occurred in 1987 and he pled guilty to both. Fisher claimed these offenses were
with prostitutes who wanted more money, that he was not guilty, but other factors prompted
his plea. Fisher violated his community supervision three times and was re-incarcerated. 
During probation he assaulted his wife. However, none of the probation violations were
sexually related. One of the violations included his removal of a satellite monitoring device,
not unlike the device he now wears. A jury found Fisher was a sexually violent predator. 
The trial court signed and entered a final judgment and order of commitment. The
judgment requires Fisher, in addition to not contacting his two 1987 victims, not to
participate in programs with persons 17 or younger, to stay 1000 feet from where children
commonly are, not to consume alcohol or controlled substances, and not to leave Texas
or to change his home residence without court approval, inter alia. Fisher was also
ordered, upon release from lock-down, to be fitted with electronic satellite monitoring
equipment by the Texas Department of Public Safety for around the clock monitoring. 
There are 11 disabilities and restrictions under the judgment and 97 more under the
commitment requirements.
          The “civil commitment requirements” expand the disabilities and restrictions of the
final judgment and order of commitment. These additional restraints consist of 97 separate
requirements of Fisher’s “treatment and supervision contract.” The second and fourth
paragraphs of the judgment’s commitment order incorporate these additional restraints by
ordering: “Michael Fisher shall follow the directive of his case manager in matters related
to his residence selection and rules.” The civil commitment requirements are also attached
and incorporated into the final judgment. 
          We observe a few of the provisions from the civil commitment requirements.


 Fisher
is forbidden to have contact with or harass program staff or volunteers. Many rules require
his cooperation with his case manager and staff as well as adherence to any future
treatment plans. Contact with family members is forbidden unless approved by the case
manager and staff. Family members may be required to submit to criminal background
checks. R-rated movies or TV programs are forbidden unless discussed with case
manager and staff. Fisher may not go to schools, swimming pools, movie theaters, public
libraries, amusements parks, arcades, or malls where children or potential victims are likely
to be. He cannot work anywhere that requires contact with women or children. Fisher may
not touch anyone without their permission. Fisher may not use drugs or drink any alcohol. 
Fisher may not buy, borrow, steal, possess, or use cameras, recorders, CD or DVD
recorders, or any other recording device. He cannot use a post office box, pick up
hitchhikers, or stop to render aid to someone stranded on a road. He cannot use an
automobile or travel without permission. He must constantly wear a tracking device and
submit to polygraph tests. There is no confidentiality


 of anything he tells counselors. 
Conversely, Fisher may not disclose the identity of anyone in the program. Finally, Fisher
must report any violation by him to his case manager.
                                                                 II
          Fisher challenges whether due process applies to a SVP proceeding. If due
process applies, then the procedural and substantive safeguards of due process cannot
be enjoyed by a person who cannot rationally or factually comprehend the hearing. Fisher
argues from Addington: “This Court has recognized that civil commitment for any purpose
constitutes a significant deprivation of liberty that requires due process protection.” 
Addington v. Texas, 441 U.S. 418, 425 (1979).
          Fisher further observes other proceedings analogous to SVP proceedings trigger
due process protections because they too can result in loss of liberty. See In re M.A.F.,
966 S.W.2d 448, 450 (Tex. 1998). Because contempt proceedings are quasi-criminal they
trigger due process concerns. Hawkins v. Walvoord, 25 S.W.3d 882, 892 (Tex. App.– El
Paso 2000, pet. denied). Additionally, a hearing for protective order in a divorce case
involves liberty issues because a person’s freedom of movement is restricted. This
process too is a quasi-criminal proceeding implicating due process. Streidel v. Streidel,
15 S.W.3d 163, 166 (Tex. App.– Corpus Christi, 2000 no pet.). Fisher posits that all these
proceedings can result in the deprivation of liberty. The SVP proceedings result in 
deprivation of liberty because a person so committed is greatly disabled from going places
and contacting people–even family members. Every aspect of his life is affected, from his
every movement to each personal contact.
          Fisher further contends due process requires a person to be aware of and be able
to participate in the proceedings against him. The proof showed Fisher was unable to
understand or assist his attorney in preparation for trial or the trial itself. His appellate
counsel argues, though Fisher was granted the right to have an attorney and attend his
trial, “since Fisher was incompetent, that right was a hollow right.”
          Finally, Fisher argues from Thompson v. Cockrell, 263 F.3d 413, 417 (5th Cir. 2001). 
Due process dictates protection of the individual against arbitrary action of the state and
ensures that adequate procedure exists to protect a substantive interest to which a person
is entitled. See id. We also are reminded by Thompson that liberty interests emanate from
either the Due Process Clause itself or from state law. Id. at 425. The State concurs that
substantive due process prevents the government from engaging in conduct that “shocks
the conscience,” citing Rochin v. California, 342 U.S. 165, 172 (1952). Due process
prevents governments from interfering with rights “implicit in the concept of ordered liberty.”
Palko v. Connecticut, 302 U.S. 319, 325-26 (1937). We agree.
          The State expands its due process argument by citing Allen v. Illinois, 478. U. S.
364, 372 (1986). “Addington demonstrates that involuntary commitment does not itself
trigger the entire range of criminal protections.” Id. The State argues that the SVP statute
is not quasi-criminal because the United States Supreme Court has consistently held such
statutes to be civil in nature, citing Kansas v. Hendricks, 521 U.S. 346, 361-65, 117 S. Ct.
2072, 138 L. Ed. 2d 501 (1997); Seling v. Young, 531 U.S. 250, 260-61 (2001); and Allen,
478 U.S. at 372. The State says that the Chapter 841 rights given to Fisher from the
criminal law do not change the statute from civil to criminal. We agree that the granting of
rights associated with criminal trials, standing alone, does not make the statute criminal. 
The State also argues that giving some safeguards applicable in criminal trials does not
turn the proceedings into criminal prosecutions requiring the full panoply of rights
applicable in criminal proceedings. It cites Allen, 478 U. S. at 372. However Allen also
notes that the fact incarceration may result (which is uniquely the case in Texas) is relevant
to the question whether the privilege against self-incrimination applies. Id. We also note
that Allen’s commitment, unlike Fisher’s commitment, was for actual treatment at a
psychiatric hospital. Id. at 373. So the gist of the State’s position boils down to its
argument, that the SVP statute is civil, therefore not quasi-criminal or criminal. 
Accordingly, the State contends Fisher has no due process right in being sane at his
hearing or being able to assist counsel at the commitment hearing. We disagree. 
          We first address Fisher’s liberty and due process claims, then undertake the issue
of whether or not the statute is punitive.
          There is no question that Fisher has a liberty interest in his commitment
proceedings. Both substantive and procedural due process are mandatory. In Foucha,
the State of Louisiana sought to perpetuate Foucha’s confinement on the basis of his
antisocial personality that rendered him a danger to himself or others. Foucha v. Louisiana
504 U.S.71, 78 (1992). The court first observed that even if constitutionally permissible,
keeping Foucha against his will in a mental institution is improper absent a civil
commitment proceedings of current mental illness and dangerousness. Id. (Texas makes
no requirement of current mental illness and dangerousness.) A convicted felon has a
liberty interest in not being transferred to a mental institution without appropriate
procedures to prove he is mentally ill. Id. at 78-79. A convicted criminal who allegedly was
mentally ill was entitled to release at the end of his term unless the State committed him
in a civil proceeding. Id. at 79 (citing Baxstrom v. Herold, 383 U.S. 107 (1966)). “[T]here
is no conceivable basis for distinguishing the commitment of a person who is nearing the
end of a penal term from all other civil commitments.” Jackson v. Indiana, 406 U.S. 715,
724 (1972) (quoting Baxstrom, 383 U.S. at 111-112). Due process contains a substantive
component that bars certain arbitrary, wrongful government actions “regardless of the
fairness of the procedures used to implement them.” Zinermon v. Burch, 494 U.S. 113,
125 (1990); see also Salerno, supra, 481 U.S. at 746; Daniels v. Williams, 474 U.S. 327,
331 (1986). Freedom from bodily restraint has always been at the core of the liberty
protected by due process from arbitrary governmental action. Youngberg v. Romeo, 457
U.S. 307, 316 (1982). “It is clear that commitment for any purpose constitutes a significant
deprivation of liberty that requires due process protection.” Jones v. United States, 463
U.S. 354, 361 (1983). We should never “minimize the importance and fundamental nature”
of the individual's right to liberty. Salerno, 481 U.S., at 750; Foucha, 504 U.S. at 79-80. 
           Texas’s highest criminal court recently held, together with the majority of states, that
to give effect to a petitioner's right to counsel and his right to test the legality of his arrest
in the extradition context, he must be sufficiently competent to consult with his counsel. 
Ex parte Potter, 21 S.W.3d 290, 296-97 (Tex. Crim. App., 2000). “Given that an alleged
fugitive is entitled to counsel and entitled to challenge the legality of his arrest and assert
defenses on the basis of which the extradition warrant may be dismissed, the accused
must be sufficiently competent to discuss with his counsel facts relating to the limited
defenses that may be raised.” Id. (citations omitted); cf. Ake v. Oklahoma, 470 U.S. 68,
77 (1985) (due process requires the state to grant indigent access to basic materials
integral to building of effective defense). “Counsel cannot provide effective representation
absent the ability to consult with the alleged fugitive regarding potential defenses about
which he may have knowledge.” Ex parte Potter, 21 S.W.3d at 297. “Where the fugitive's
incompetence prevents him from being able to consult with his counsel in connection with
the issues of his identity and presence, those defenses may be foreclosed.” Id. The court
concluded that while the broadest understanding of the proceedings and greater ability to
consult with counsel is not necessary, due process requires that the alleged fugitive has
sufficient mental competency to consult with and assist counsel on the issues of identity
and presence. 
          The Supreme Court in Dexter v. Hall, 82 U.S. 9 (1872), held that a mental
incompetent cannot be held to his contract: 
[A] person non compos mentis, has nothing which the law recognizes as a
mind, and it would seem, therefore, upon principle, that he cannot make a
contract which may have any efficacy as such. He is not amenable to the
criminal laws, because he is incapable of discriminating between that which
is right and that which is wrong. The government does not hold him
responsible for acts injurious to itself. Why, therefore, should one who has
obtained from him that which purports to be a contract be permitted to hold
him bound by its provisions, even until he may choose to avoid it? If this
may be, efficacy is given to a form to which there has been no mental
assent. 

Id. at 20. So we ask, if a person cannot contract away his property without mental
capacity, can the government force an incompetent to sign a civil commitment contract the
person cannot comprehend or keep? May mentally retarded persons sign away their
liberties? Fisher was ordered to sign such a contract.
          In Texas, a person such as Fisher, suffering from a mental illness, is guaranteed all
the rights, benefits, responsibilities and privileges afforded by the constitutions and laws
of the United States and Texas. Barclay v. Campbell, 704 S.W.2d 8, 11 (Tex. 1986) (citing
Tex. Rev. Civ. Stat. Ann. art. 5547-80(a) (Vernon Supp.1985) (Barclay's mental illness did
not foreclose his right to be informed of material risk that could influence a reasonable
person in making a decision to give or withhold consent to a medical procedure). 
          We have held that the standard for incompetence to determine whether a person
is mentally ill, mentally retarded, or both, did not violate due process where each category
protects equally. Villarreal v. State, 860 S.W.2d 529, 535 (Tex. App.– Corpus Christi 1993,
pet. ref’d). In Villarreal, the portions of the statute that deal with the conditions of mental
illness or retardation disjunctively, are those that refer to institutional placement and
treatment options. Id. The standard for incompetence is the same whether the person is
mentally ill, mentally retarded, or both, under conventional civil commitments. Id. Yet the
Texas SVP act, while facially claiming to be a civil commitment statute, does not afford the
equal protection of the conventional civil commitment act. To the contrary, the act does
not provide for the mentally ill or mentally retarded. Thus the act meets neither the due
process requirements for those mentally ill or retarded, nor does it meet the due process
requirements of the criminal law. Additionally, the law fails to meet constitutional muster
as a true civil commitment because of the absence or any lack-of-control determination. 
Kansas v. Crane 534 U.S. 407, 412 (2002).


 The law fails to meet constitutional muster
as a criminal statute because it fails to follow criminal procedures for the allegedly mentally
incompetent. Tex. Code Crim. Proc. Ann. § 46.03 (Vernon 2001). In other words, the
Texas SVP act, as noted by the trial judge and the State, does not provide for mental
incompetency, although many liberties are affected. Thus, the mentally incompetent is
deprived of both treatment under the conventional mental health laws, and of the
protections of certain criminal rights. Yet the Texas law lacks the United States Supreme
Court-mandated finding that the offender cannot control his sexual impulses. According
to the United States Supreme Court, If offenders could control their sexual deviancies, they
would be subject to the criminal law. Crane, 534 U.S. at 412 (sexual offenders subject to
civil commitments must be distinguished from other dangerous persons more properly
dealt with in the criminal proceedings).
          Because the SVP statute provides for assistance of counsel, due process requires
a person to be able to enjoy that protected right. Little v. Streater, 452 U.S. 1, 16 (1981)
("[A] statute . . . may be held constitutionally invalid as applied when it operates to deprive
an individual of a protected right although its general validity as a measure enacted in the
legitimate exercise of state power is beyond question."). According to the record, Fisher
lacked factual and rational knowledge of the proceedings and was unable to assist his
attorney prepare a defense. “[A] State must afford to all individuals a meaningful
opportunity to be heard if it is to fulfill the promise of the Due Process Clause.” Boddie v.
Connecticut, 401 U.S. 371, 379 (1971). We hold that the unchallenged lack of mental
competency to assist his attorney deprived Fisher of a meaningful opportunity to be heard. 
See Powell, 579 F.2d at 330; Ex parte Potter, 21 S.W.3d at 296-9. The fundamental
requirement of due process is the opportunity to be heard “at a meaningful time and in a
meaningful manner.” Armstrong v. Manzo, 380 U.S. 545, 552 (1965); Grannis v. Ordean,
234 U.S. 385, 394 (1914). 
          We conclude that whether the SVP is civil or quasi-criminal, Fisher’s liberty interests
in a fair proceeding, including his statutory right to counsel, were violated. His due process
rights were violated because competent evidence indicated his incapacity both to
participate in the proceeding in an effective way and his demonstrated inability to factually
or rationally utilize his right to counsel. 
                                                                III
          Next we address the State’s contention that the SVP statute is a purely civil statute
and therefore does not afford many criminal due process guarantees to Fisher.


 At the
same time, we address Fisher’s related issue that the statute is punitive facially, and as
applied, because Fisher does not have the mental ability to understand or comply with the
order of commitment. Furthermore, if the statute is punitive, then there are additional
reasons why Fisher clearly has the right to be sane at his hearing, able to assist counsel,
and is entitled to a hearing on competency before proceeding. 
          The State argues, and we agree, that the “as applied” argument may not apply if the
SVP statute is civil. The argument is by extrapolation. The United States Supreme Court
in construing the Washington SVP statute, held that such an act could not be
unconstitutional “as applied” when that state’s supreme court and the Ninth Circuit had
already held the statute to be civil in nature. Seling, 532 U.S. at 264-65 


 (in context of
double jeopardy and ex post facto claims, “as applied” analysis would prove unworkable
because such analysis would never conclusively resolve which particular scheme is
punitive). The State argues: “If Fisher were subjected to the criminal penalty clause, he
would then be afforded all of the procedural safeguards offered to criminal defendants.” 
Texas criminal law clearly proscribes the trial of a mentally incompetent person. Thus, if
the Texas SVP statute is punitive in purpose or manifest effect, Fisher is entitled to a
competency hearing before proceeding to the initial commitment trial.
          The State expands its ripeness argument countering Fisher’s claim that he is
doomed to violate the terms of commitment because he cannot understand the orders. 
Citing Patterson v. Planned Parenthood, 971 S.W.2d 439 (Tex. 1998), the State argues
that uncertain or contingent future events may not occur. See Id. at 442. The proper
course for Fisher is to challenge the criminal penalty clause after that portion has been
applied to him. While the State’s argument is not without some merit, it ignores the thrust
of Fisher’s argument. Fisher argues the SVP act is objectively punitive and retributive in
multiple aspects, not merely because it attaches felony penalties. Alternatively, if the State
is correct that Seling prohibits an “as applied” analysis after a statute has been found to
be civil, then Fisher could be prohibited from raising this argument later after being
criminally charged. See Seling, 532 U.S. 265-264.



          Both parties aptly cite and argue from Hendricks, 521 U.S. 346.


 We are
constrained to note that Hendricks is a plurality opinion by Justice Thomas, joined by Chief
Justice Rehnquist and Justices O’Connor and Scalia. Justice Kennedy filed a concurrence
and warned that mental and medical treatment should not be a sham for punishment. 
Justices Breyer, Stevens, Souter and Ginsburg dissented to parts of the majority opinion. 
The State argues, and we agree, that the Kansas law is similar to the Texas SVP statute. 
However, we note striking and material differences, best exemplified by following the
Hendricks analysis and its application of the Kennedy factors. Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-69 (1963). 
          The categorization of a statute or proceeding as civil or criminal is first of all a
question of statutory construction. Hendricks, 521 U.S. at 361. If the Legislature meant
to establish “civil” proceedings, we should ordinarily defer to its intent unless there is the
clearest proof that the scheme is so punitive in purpose or effect that it negates the State’s
attempt to deem that statute civil. Id. (citing United States v. Ward, 448 U.S. 242, 248-49
(1980).


 Unlike the face of the Kansas statute, which suggested only the creation of a civil
statute, the face of the Texas statute imposes severe criminal penalties for the violation of
any of the terms of commitment. Tex. Health & Safety Code Ann. § 841.085 (Vernon
2000). The criminal penalty facially provides: “A person commits an offense if the person
violates a requirement imposed under Section 841.082. An offense under this section is
a felony of the third degree.” Id. Because Fisher, and most all prisoners,


 have two prior
felony convictions in order to invoke the act, they automatically fall under Texas’ felony
enhancement scheme. Thus, under Texas law, virtually any conviction of violation of the
SVP act mandates a minimum penitentiary term of 25-99 years. Tex. Pen. Code Ann. §
12.42(d) (Vernon 1999). A mandatory life sentence follows the conviction for any violation
of § 841.085 of the Health and Safety Code if the committed person is previously
convicted of aggravated sexual assault. Id. § 12.42(d)(2)(B)(ii). In practical legal effect,
if Fisher or anyone with a prior aggravated sexual assault conviction, uses a post office box
or stops to help a person “stranded on the road” that person is subject to a mandatory life
sentence.


 The effect of disobedience to the SVP statute, requiring imprisonment for up
to life, clearly embraces the primary objectives of criminal punishment: retribution and
deterrence. It is retributive because it punishes for past criminal conduct. It is also patently
a deterrent; a violation of the terms of commitment could mean between 25 years
incarceration up to and including a mandatory life sentence. While the Texas act, like
Kansas, initially states it is a civil act providing for civil commitment proceedings, unlike
Kansas, the teeth of the Texas law are severe criminal penalties. This objective
manifestation of the law is punitive.
          We are not informed of any state that attaches felony penalties to its SVP statute,
except Texas.
          The State argues that if Fisher were indicted for violating any provision of the SVP
statutes, he would then be “afforded all of the safeguards offered to persons facing criminal
charges.” Such argument begs the question of Fisher’s rights at the proceeding in
question. A promise of possible future protection does little to address the deprivation of
present rights. Any prospective insanity defenses would only address his mental state at
the time of a violation or his subsequent criminal trial. We know of no Texas law that
would allow a person’s mental disabilities at the time of his SVP commitment hearing to
be a defense to subsequent prosecution. Certainly the SVP statute provides no such
protections. 
          Hendricks notes that Kansas places its SVP statute in its probate code, not its
criminal code, thus evidencing intent of the civil nature of the statute. Hendricks, 521 U.S.
at 362. In somewhat similar fashion, Texas places its SVP statute in its Health and Safety
Code. Unlike Kansas, Texas also places some of its highest priority crimes in its Health
and Safety Code. Many felony and misdemeanor drugs crimes are found in the Health and
Safety Code Chapters 481, 482, 483 and 485. These chapters delineate hundreds of
criminal offenses, including manufacturing and distribution of controlled substances,
dangerous drugs and abusable chemicals. Several other chapters of the Health and
Safety Code deal with criminal statutes and penalties. These include: Chapters 195, 341,
501, 765 and 793, inter alia. We conclude that the code placement in Texas does not
necessarily implicate the act as civil, and rather is consistent with the placement of other
criminal laws.


 The manifest punitive intent of many provisions of the Health and Safety
Code is apparent.
          Like Kansas, the Texas act states it is civil. See Hendricks, 521 U.S. at 361. The
Texas Legislature found “that a civil commitment procedure for the long-term supervision
and treatment of sexually violent predators is necessary and in the interest of the state.”
Tex. Health & Safety Code Ann. § 841.001 (Vernon 2001). However, "It is well settled
that realities rather than benign motives or non-criminal labels determine the relevance of
constitutional policies.” In re Winship, 397 U.S. 358, 365-366 (1970); In re Gault, 387 U.S.
1, 21, 27, 50, (1967); Breed v. Jones, 421 U.S. 519, 528 (1975); Allen, 478 U. S. at 369. 
          The Hendricks Court held that the Kansas Act does not implicate either of the two
primary objectives of criminal punishment: retribution or deterrence. Hendricks, 521 U.S.
at 361–62. According to our highest court, Kansas law is not retributive because prior
criminal conduct is used solely for evidentiary purposes to show mental abnormality or to
support a finding of future dangerousness. Id. at 352. Texas law decidedly differs. The
Texas SVP statute begins and ends with criminal penalties. First, multiple prior sexually
violent convictions are a fundamental and jurisdictional requirement of the act. Section
841.003(b) provides: “A person is a repeat sexually violent offender for the purposes of
this chapter if the person is convicted of more than one sexually violent offense and a
sentence is imposed for at least one of the offenses or . . . .”


 Tex. Health & Safety Code
Ann. § 841.003(b)(Vernon 2000). Without two or more prior sexually violent convictions
or the statutory equivalent, no proceedings may be initiated. Id. The statute further
specifies the jurisdiction of either the Texas Department of Criminal Justice, or the Texas
Department of Mental Health and Mental Retardation, to file appropriate notices sixteen
months before the release of a convicted or committed violent sex offender. Id. §
841.021(c). Unlike the Hendricks Court holding that past conduct is used “solely for
evidentiary purposes,” past criminal conduct is a sine qua non for the initiation of Texas
proceedings. Likewise, the nature of past criminal conduct is jurisdictional not only as to
agency responsibility but also before any trial court can entertain such an action. 
           It is instructive to note Hendricks reliance on Allen, 478 U.S. at 371. Allen in turn
relies on the Illinois Supreme Court holding in People v. Allen, 481 N. E. 2d 690 (Ill. 1985). 
There, the Illinois court construed its SVP statute as requiring proof of three separate
elements: (1) the existence of a mental disorder for more than one year; (2) the existence
of criminal propensities to the commission of sex offenses; and (3) the existence of
demonstrated propensities toward acts of sexual assault or acts of sexual molestation of
children. Id. at 697. Because the Illinois statute required more than propensity to commit
a sex offense, that state required additional proof that the defendant has "demonstrated"
this propensity. Id. Thus, the State had to prove at least one act or attempted act of
sexual assault or sexual molestation. Id. “There is, however, nothing in the statute
requiring the State to prove multiple sex crimes. One purpose of the statute is to prevent
mentally ill persons from being held criminally responsible for crimes committed while
mentally ill.” Id. “We therefore hold that the plural language of the statute–‘acts of sexual
assault or acts of sexual molestation’--refers to the defendant's future propensities, not to
the demonstrated conduct.” Id. Texas law vastly differs. Rather than to prevent mentally
ill persons from being held criminally responsible for crimes committed while mentally ill,
Texas makes no provision for traditional mental illness for persons such as Fisher, and
facially makes them criminally responsible for violating their commitment orders. Tex.
Health & Safety Code Ann. § 841.085 (Vernon 2000). Therefore, the statute ends with
criminal punishment as we observed. Texas law begins with criminal punishment because
it requisites proof of multiple sex crimes. Id. § 841.003. Contrary to Hendricks, multiple
criminal convictions are the usual prerequisite for commitment. Cf. Hendricks, 521 U. S.
at 362, The Supreme Court concluded, “An absence of the necessary criminal
responsibility suggest that the State is not seeking retribution of a past misdeed.” Id. 
Conversely, logic dictates our conclusion that the presence of the necessary criminal
responsibility suggests another objective manifestation that the State is seeking retribution
of past misdeeds. Moreover, were the State not seeking general deterrence of future
criminal acts, why pass the law at all?



          The State argues the absence of scienter noted in Hendricks. Id. at 362. Ordinarily,
absence of scienter is evidence the statute is not intended to be retributive. Id. In Texas,
scienter sandwiches the second prong of the statute. While the State argues that scienter
is not a required finding, perhaps in the second prong of the statute, scienter would trigger
its enforcement provisions. See Tex. Health & Safety Code Ann. § 841.085 (Vernon
2000). Furthermore, scienter is also typically required by law in order to order to establish
the first prong. Id. § 841.003. The law states:
(a) A person is a sexually violent predator for the purposes of
this chapter if the person:
 
 (1) is a repeat sexually violent offender; and
 
 (2) suffers from a behavioral abnormality that makes the person
 likely to engage in a predatory act of sexual violence.

Id. Typically, a repeat sexually violent offender would include a conviction of sexual
assault which requires scienter. Tex. Pen. Code Ann. § 22.011. Likewise aggravated
sexual assault requires scienter. Id. § 22.021. Notably, perhaps the more egregious
indecency-with-a-child statute, requires no scienter. Id. § 21.11(a)(1). Whether or not
the felony penalty provisions of the SVP act require scienter, remains to be determined. 
See Tex. Health & Safety Code Ann. § 841.085 (Vernon 2000) (person commits a felony
if the person violates a requirement of the act). However, there can be little doubt that a
“knowing and intentional” violation of the terms of commitment is a felony offense. Id. 


 
We conclude the application of the first prong of the act typically requires a prior finding of
scienter and, similarly, the enforcement criminal penalties clearly attach with a knowing
violation of the terms of commitment. 
          We also believe there is merit in Fisher’s argument regarding the required finding
under the second prong. Specifically, the fact finder must find beyond a reasonable doubt
that the person will commit an act for the purpose of victimization directed toward a
stranger, casual acquaintance, or a person in a relationship established for the purpose
of victimization. Id. § 841.002(5). An act committed for a “purpose,” clearly connotes
scienter.
          Even assuming arguendo, a partial absence of this hallmark of scienter, such
absence does not and cannot distinguish the Texas statute as civil. On balance, the Texas
act’s multiple requirements of scienter, objectively characterize the statute as punitive.
          We likewise note another of the Kennedy factors not particularly addressed in
Hendricks. That is the fact that the behavior to which the act applies is already a crime. 
Kennedy, 372 U.S. at 168. As we just noted, the first prong deals with past criminal
activity. The second prong of the SVP act requires the likelihood of committing a predatory
act of sexual violence, i.e., will commit an act for the purpose of victimization. Thus, most
would perceive yet another objective manifestation of the punitive nature of the act.
          The Hendricks Court also notes that under the Kansas act, a confined individual 
is not subject to the more restrictive conditions placed on state prisoners, but instead
experiences essentially the same conditions as any involuntarily committed patient in the
state mental institution. Hendricks, 521 U. S. at 363. Rather, the Texas law places 108
restraints and disabilities on Fisher. Fisher is fitted with satellite monitoring equipment by
an arm of law enforcement, the Department of Public Safety. Law enforcement
electronically monitors him every moment of every day. He is subject to repeated
polygraph examinations. He is required to give blood and hair samples for DNA profiling. 
He cannot leave the state and shall not consume alcohol or controlled substances. He
must notify his case manager within 48 hours of any change in health or job. He may not
move his home without court approval. Other disabilities, already noted, include: any
contact with family members forbidden unless approved by the case manager and staff;
family members may be required to submit to criminal background checks; R-rated movies
or TV programs are forbidden unless discussed with case manager and staff; Fisher must
stay more than 1000 feet away and may not go to schools, swimming pools, movie
theaters, public libraries, amusement parks, arcades or malls where children or potential
victims are likely to be (even though he is not a pedophile); he cannot work anywhere that
requires contact with women or children; Fisher may not touch anyone without their
permission; Fisher may not buy, borrow, steal, possess or use cameras, recorders, CD
or DVD recorders or any other recording device; he cannot use a post office box, pick up
hitchhikers or stop to render aid to someone stranded on a road; and he cannot use an
automobile or travel without permission. These restraints far exceed normal criminal law
probation or community supervision. The general deterrent effect critically observed by
Justice Kennedy is patent. Hendricks 521 U.S. at 372 (Kennedy, J., concurring).
          Hendricks observes the State may take measures to restrict the freedom of the
dangerously mentally ill.


 Id. Far removed from the realm of medical or psychiatric
assistance, many disabilities of the Texas law exceed criminal probation or community
supervision. See Tex. Code Crim. Proc. Ann., art. 42.12 (Vernon 2000). While many of
the restrictions on a person found to be a sexually violent predator are identical to Texas
criminal community supervision law, some are even more invasive, as noted above. 
Notably, a judge may extend community supervision under the penal system for ten years. 
Id. One subject to the court’s indeterminate supervision under the SVP law, is exposed to
a new felony term from 25 years to lifetime confinement in the state penitentiary. See Tex.
Health & Safety Code Ann. § 841.085 (Vernon 2000). And the legislature unequivocally
enunciated it seeks “long-term supervision and treatment.” Id. § 841.001.
          It is true the Texas law, unlike Kansas, does not at its initial implementation actually
confine the person in a treatment center. However, the vast majority of effectively penal
parole conditions, can hardly be said to be less restrictive or coercive than the conditions
of a patient at a Texas mental institution. At most, such a person is restricted and confined
for one year. Id. § 574.066. One-year hospital confinement without superimposed felony
repercussions, is sensibly limited and accompanied by procedural safeguards. This
contrasts with indeterminate long-term commitment, enforced by felony imprisonment,
accompanied by penal parole conditions, and additional restrictions often exceeding those
imposed by the criminal law. Indeed, the elaborate structure for release from supervision
and treatment, contrary to conventional mental health commitments, only requires a bi-annual “review.” Id. § 841.10. The State council contracts for an expert who reports to the
judge. Id. The judge then conducts a review at which the person is not entitled to attend,
though counsel may appear. Only if the judge determines there is probable cause that the
person’s behavioral abnormality has changed, is it possible for the person to have a hearing
with certain limited constitutional protections. Id. § 841.103.


 The certain effect of the law
is to grant review only when the executive or judicial branch of Texas government grants
leave. The initial and requisite burden of proof is effectively on the committed to show the
change. The State need not show the further need for commitment. Justice Burgess, in
his dissent in Beasley, would hold these review provisions of the SVP act unconstitutional
for violation of the equal protections clause. See Beasley, 95 S.W.3d at 651(Burgess, J.,
dissenting). We doubt the Texas act meets the constitutional qualifications of Jones. 
Jones, 463 U.S. at 368 (even a criminal acquittee may not be held longer unless the person 
is both mentally ill and dangerous).



          Therefore, unlike Kansas, persons committed under the Texas SVP are subject to
conditions often more onerous than conventional civil commitment. See Hendricks, 521
U.S. at 363. As noted, the Texas indeterminate commitment is more onerous than many
comparable penal provisions.
          Justice Thomas, writing for the plurality, held that potentially indefinite duration is not
evidence of punitive intent. Hendricks, 521 U. S. 363. He stated: “If, at any time, the
confined person is adjudged ‘safe to be at large,’ he is statutorily entitled to immediate
release.” Id. at 363-64. “If Kansas seeks to continue the detention beyond that year, a
court must once again determine beyond a reasonable doubt that the detainee satisfies the
same standards as required for the initial confinement.” Id. at 364. According to Justice
Thomas, this requirement demonstrates that Kansas does not intend that the committed
individual remain confined any longer than the period of time that the person suffers from
mental abnormality. Id. Texas law is inapposite.
            The Texas SVP law disavows its own mental health statute’s one year commitment
limitation, and reduces or eliminates significant other substantive and procedural
safeguards. Cf. Tex. Health & Safety Code Ann. § 574.066 (Vernon 1992). Under the
Texas conventional mental health statute, before a renewal of order for extended mental
health services beyond one year can be entertained: (1) a county or district attorney or other
adult must file an application to renew an order for extended mental health services; (2) the
application must explain in detail why the person requests renewal; (3) the application to
renew an order committing the patient to extended inpatient mental health services must
also explain in detail why a less restrictive setting is not appropriate; (4) the application must
be accompanied by two certificates of medical examination for mental illness signed by
physicians who examined the patient during the 30 days preceding the date on which the
application is filed; (5) the patient, the patient's attorney, or other individual may request a
hearing on the application or the court may set a hearing on its own motion; (6) a court may
not renew an order unless the court finds that the patient meets the criteria for extended
mental health services prescribed by Sections 574.035(a)(1), (2), and (3) and the court must
make the findings prescribed by this subsection to renew an order, regardless of whether
a hearing is requested or set; and (7) a renewed order authorizes treatment for not more
than 12 months. Id. 
          The Texas SVP act fails the Kansas safeguards elucidated by Justice Thomas, to
confine no longer than necessary. It ignores or vitiates its own laws providing for the mental
health rights to retarded persons. A person thought to be mentally retarded has the right
promptly to receive a determination of mental retardation using diagnostic techniques that
are adapted to that person's cultural background, language, and ethnic origin to determine
if the person is in need of mental retardation services. Tex. Health & Safety Code Ann. 
§592.018 (Vernon 2000). This was denied Fisher, and presumably all who fall under the
SVP act. Each person has the right to live in the least restrictive habilitation setting and to
be treated and serve in the least intrusive manner appropriate to the client's individual
needs. Id. § 592.032 (“Each client has the right to live in the least restrictive habilitation
setting and to be treated and served in the least intrusive manner appropriate to the client's
individual needs.”). Fisher’s standard 100-plus disabilities are not tailored to his individual
needs but rather represent a net cast to the broadest reach of possible variables. Thus, the
Texas act fails to meet the Kennedy test of whether the act is excessive in relation to the
alternative purpose assignable to it. Kennedy, 372 U.S. at 169. Unlike a conventional
mental commitment not to exceed one year, the SVP trial evidence need not include either
(1) expert testimony or (2) evidence of a recent overt act or a (3) continuing pattern of
behavior that tends to confirm the illness. See Tex. Health & Safety Code Ann. § 574.035
(Vernon 2000). We hasten to add that although not required, the State did produce expert
testimony in this particular case.



          There is little doubt that like Kansas, Texas assigned a non-punitive, alternative
purpose, to its act. See Hendricks, 521 U. S. 361. The Legislature found that a small
extremely dangerous group of sexually violent predators exists, that conventional treatment
does not work and is inadequate to address the risk of “repeated predatory behavior that
sexually violent predators pose to society.” Tex. Health & Safety Code Ann. § 841.001
(Vernon 2000). The critical issue persists, however, whether objective manifestations of
purpose indicate conclusively that the provisions in question can only be interpreted as
punitive. Kennedy, 372 U.S. at 168. 
          Fisher complains he is not offered the opportunity for appropriate treatment. This
plea seems to be denied by Hendricks: “[W]e have never held that the Constitution prevents
a State from civilly detaining those for whom no treatment is available, but who nevertheless
pose a danger to others.” Hendricks, 521 U.S. at 366. “Similarly, it would be of little value
to require treatment as a precondition for civil commitment of the dangerously insane when
no acceptable treatment existed.” Id. Alternatively, the Court held, the possibility that an
ancillary purpose of the act was to provide treatment, and no treatment is provided, does
not require a conclusion the act is punitive. Id. at 367. If treatment is as irrelevant as
described, should not the law require a “lack of control” element and finding? Crane
answers the question in the affirmative.
                                                                  IV
                                               After Hendricks: Crane
          After Hendricks, the United States Supreme Court markedly curtailed the application
of this prior holding which we analyzed at length above. The Constitution does not permit
“commitment of the type of dangerous sexual offender considered in Hendricks without any
lack-of-control determination.” Crane, 534 U.S. at 412. Sexual offenders subject to civil
commitments must be distinguished from other dangerous persons more properly dealt with
in the criminal proceedings. Id. “That distinction is necessary lest ‘civil commitment’
become a ‘mechanism for retribution or general deterrence.’“ Id. (citing Hendricks, 521 U.S.
at 360 (Kennedy, J., concurring)).


 Hendricks was a pedophile who admitted lack of
volitional control, coupled with a prediction of future dangerousness. Id. Hendricks, whose
condition was listed in DSM-IV 571-572, stated he could not control the urge to molest
children. Id. at 414 (Scalia, J., dissenting). In Justice Scalia’s dissent, (joined by Hendricks
author Justice Thomas), he notes the Kansas act, (like Texas’s), contains no requirement
of inability to control. Id. at 419. He also clearly notes the majority now establishes the
requirement of a separate finding of inability to control behavior. Id. 
          We can only conclude that Crane amplifies the Kennedy factors and modifies
Hendricks. In addition to dangerousness, the requisite mental element is inability to control
behavior. Id. at 412. This is a required finding by the fact finder. Id.


 There is no
requirement of total or complete lack of control. Id. at 411. Hendricks demonstrated lack
of control because of his serious sexual mental disorder–pedophilia–thus providing proof
of inability to control behavior. Id. at 413. Hendricks himself testified he could not “control
the urge” to molest children. Id. at 414. 
          Because neither party briefed the application of Crane, we do not consider whether
the absence of a finding of inability to control behavior is fundamental error.


 Rather, we
apply the rationale of Crane as one more objective manifestation in determining whether
the statute is punitive facially or as applied to Fisher. Because the Legislature has not
narrowly crafted the sexually violent predator statute with the necessary “inability to control”
requirement, the act is more likely designed as a mechanism for retribution or general
deterrence. 
                                                                  V
          We note our disagreement with the plurality opinion of our sister court. The
Beaumont Court of Appeals was handed the herculean task of deciding whether to enjoin
the application of the SVP act. Beasley v. Molett, 95 S.W.3d 590 (Tex. App.–Beaumont,
2002, no pet. h.). It was faced with fourteen points of first impression.


 We only address
our disagreement with that portion of their opinion dealing with the nature of the proceeding. 
Id. at 607-08.


 
          We agree that the act imposes certain restraints similar to those imposed in
community supervision (parole). Id. We agree that “[t]he acts that lead the person to
initially qualify for the status of ‘sexually violent predator’ are crimes.” Id. at *12. But we
differ on the court’s conclusion that there is no retribution because there is no culpability for
prior criminal conduct and that the statutory scheme of treatment and supervision for the
purpose of avoiding the menace of such persons is not excessive. See id. We believe the
myriad affirmative disabilities and restraints placed on Fisher, restrictions against all
touching, even his children, avoiding all venues with women or children, family criminal
background checks, multiple polygraphs, satellite monitoring, and criminal felony penalties
are excessive and go well beyond restraints necessary to protect the public. We have also
outlined how such disabilities under the Texas act have historically been treated as punitive
and how criminal scienter is required. Without further reiteration, we believe our detailed
analysis readily supports our respectful disagreement with our sister court. 
          That court has more recently partially addressed some of the specific issues we
discuss. See In re Commitment of Martinez, 98 S.W.3d 373 (Tex. App.–Beaumont 2003,
no pet. h.). The case is readily distinguishable because all three experts testified Martinez
was competent to stand trial. Id. at 375-76. By dicta, the court held, relying on Hendricks
and its own holding in Beasley, that no competency hearing was required. Id. The court
also held Martinez’s claim that he could not comply with the commitment order was not ripe. 
Id. (relying upon Patterson, 971 S.W.2d at 443). Because evidence shows Fisher to be
both mentally retarded and mentally incompetent, we do not believe Martinez is controlling.                                                                 VI
          Finally, we believe it helpful to further factually distinguish the Hendricks case from
Fisher’s. Fisher was convicted of two sexual assault crimes in February and August of
1987. Both convictions were based upon pleas of guilty. Fisher has served all of his time,
which was extended because his probation was revoked three times for non-sexual
matters–including the removal of his monitor. The two prior sexual violations were with
adult women, possibly involving payment for prostitution. According to Fisher, he disagreed
with the women about money. There was no proof of other sexual crimes although there
was an alleged verbal threat toward a mental hospital nurse at Rusk State Hospital. There
is no diagnosis of pedophilia or other recognized sexually related mental disorder. There
was no allegation of involvement with children, yet Fisher was given the same restrictions
as a practicing pedophile such as Hendricks. Hendricks was convicted of taking ‘indecent
liberties’ with two 13-year-old boys. Hendricks had a “chilling history” or repeated child
sexual molestation including a 7-year-old girl, two young boys while working at the carnival,
performing oral sex on an 8-year-old girl, and fondling an 11-year-old boy. Hendricks, 521
U.S. at 354. His conduct and multiple convictions spanned the years 1955 through his
release in 1994. Id. at 354-55. He admitted his pedophilia, that he was not cured after
professional help, and that he could not control his sexual urges toward children. Id. at 355. 
Most importantly, Hendricks demonstrates the type of mental illness constitutionally
necessary to impose the liberty encroachments and restrictions under a sexually violent
predatory law. As a practicing pedophile, Hendricks arguably had the component lack of
control sexual mental abnormality to justify commitment. See Crane, 534 U.S. at 412. 
Schizophrenia and Fisher’s two remote 1987 sexual assaults, do not demonstrate the
component lack of sexual control that would justify the imposition of 100-plus civil and penal
restrictions of the Texas law.
          We also note nine additional punitive aspects of the Texas law contrasted with the
substantially greater constitutional safeguards of the Kansas statute or as observed in
Hendricks. We list these other objective manifestations. (1) In addition to Kansas
procedural safeguards allowing a confined person’s immediate release at any time the
person is adjudged safe to be at large, Kansas also affords (2) “all constitutional rights
available to defendants at criminal trials, other than the right not to be tried while
incompetent.” Kan. Stat. Ann. § 59-29107 (1994). (3) Texas assigns a majority of the
charging board (Multidisciplinary Team) from criminal law enforcement. The team includes
two from mental health but is numerically controlled by three persons from the Texas
Department of Criminal Justice, (4) one of whom must be from the victim services office of
that department; Tex. Health & Safety Code Ann. § 841.022 (Vernon 2000). (5) A
“prosecutor” is selected from a special division of the prison prosecution unit, separate from
the part of the unit responsible for prosecuting criminal cases. Id. § 841.004 (Prison
Prosecution Unit). (6) No overt threat or act from the recent past is required. (7) No
substantial threat or imminent risk is required. Cf. Broussard. v. State, 827 S.W.2d 619,
622 (Tex. App.--Corpus Christi 1992, no writ). (8) No notice is given to a prisoner or mental
health patient that he or it is being evaluated for subjugation to the SVP act. (Nor is
counsel provided at this juncture.) (9) The Multidisciplinary team’s screening and
assignment of charges to prosecutors are now secret meetings not subject to the Texas
Open Meetings Act. See Tex. Gov. Code § 551.002 (Vernon 1994); Beasley, 95 S.W.3d
at 599.
          Finally, we note precedent very similar to Fisher’s case. Jackson dealt with a
mentally defective deaf mute with a mental level of a pre-school child. Jackson 406 U.S. at
717. There the state, not unlike Texas, did not afford Jackson a substantial opportunity for
early release. Id. at 729. Our highest court observed that Jackson was subjected to a
more lenient commitment standard and to a more stringent standard of release than those
generally applicable to all others not charged with offenses. In effect, to permanently
institutionalize without showing either the requirements for commitment or the opportunity
for release afforded by conventional commitment, Indiana deprived the petitioner of equal
protection of the laws under the Fourteenth Amendment. Id. at 729-30. In other words,
Jackson was entitled to the protections of conventional commitment protection under
circumstances similar to Fisher’s. Because Fisher’s commitment was as an outpatient, we
also note there is no distinction in application of due process protection depending on
whether the commitment is inpatient or outpatient. In re D.F.R., 945 S.W.2d 210, 214-15
(Tex. App.–San Antonio 1997, no. pet.)
          We sustain Fisher’s first two issues regarding competency.


 We conclude that the
Texas SVP statute is manifestly punitive, both facially and as applied. Accordingly, Fisher
is entitled to rights under the criminal law, specifically including the opportunity to effectively
exercise his right to counsel, the right to be competent at trial, and understand and assist
in the trial proceedings. Additionally, substantive due process requires he be mentally
competent to comply with the order of commitment. He has the substantive right not to
proceed to trial when he was incompetent. Even if the SVP statute were to be found civil
or quasi-criminal, Fisher is minimally entitled to enjoy the statutorily specified opportunity
to competently exercise his right to counsel. Nor do we see any overriding need of society
that would refuse Fisher’s right to be found sane before his proceedings.
          The loss of liberty produced by involuntary commitment is more than a loss of
freedom from confinement. Vitek, 445 U.S. at 492. Due process requires that the nature
of commitment bear some reasonable relation to the purpose for which the individual is
committed. Jones, 463 U.S., at 368; Jackson, 406 U.S. at 738. We must distinguish
between sexual offenders subject to civil commitments and other dangerous persons more
properly dealt with in criminal proceedings lest “civil commitments” become a “mechanism
for retribution or general deterrence.” Crane 534 U.S. at 412. Because we hold that Fisher
was denied substantive and procedural due process, we reverse and remand for further
proceedings consistent with this opinion.
               DON WITTIG
                                                                                      Retired Justice
 
Justice Castillo Dissenting.
Opinion delivered and filed this the
18th day of December, 2003.
 
 
 
NOTE: ATTACHMENTS TO OPINION NOT INCLUDED IN THIS POSTING. FOR A COPY
OF OPINION WITH ATTACHMENTS, PLEASE CONTACT CLERK AT
CATHY.WILBORN@COURTS.STATE.TX.US.
 
* * * * * * * * *



 
 
 
 
                               NUMBER 13-01-00714-CV
 
COURT OF APPEALS
 
THIRTEENTH DISTRICT OF TEXAS
 
CORPUS CHRISTI – EDINBURG
                                                                                                     

THE COMMITMENT OF MICHAEL FISHER,                          Appellant,
 
v.
 
THE STATE OF TEXAS,                                                    Appellee.
                                                                                                     
 
On appeal from the 284th District Court
of Montgomery County, Texas.
                                                                                                     

DISSENTING OPINION
Before the Court En Banc
 
Dissenting Opinion by Justice Castillo
 
          Assuming without deciding that appellant presented his specific constitutional
challenges to the trial court and thus preserved error, I respectfully dissent for the
reasons stated by the Austin court of appeals in In re Browning, 113 S.W.3d 851, 858-59 (Tex. App.–Austin 2003, no pet. h.) and the Beaumont court of appeals in In re
Martinez, 98 S.W.3d 373, 375-76 (Tex. App.–Beaumont 2003, no pet.) (per curiam)
and Beasley v. Molett, 95 S.W.3d 590, 607-08 (Tex. App.–Beaumont 2002, pet. filed). 

                                                                        ERRLINDA CASTILLO
                                                                        Justice
 
 
Dissenting Opinion delivered and filed
this the 18th day of December, 2003.